

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00219-CV

———————————————

EL DURANGUENSE FORT WORTH INC. D/B/A EL DURANGUENSE,
Appellant

V.

TEXAS ALCOHOLIC BEVERAGE COMMISSION

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-307859-19

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

The Texas Alcoholic Beverage Commission (TABC) cancelled El Duranguense Fort Worth, Inc.'s (El Duranguense) alcoholic-beverage permits, the trial court's judgment affirmed the TABC's order, and El Duranguense now appeals from the trial court's judgment. El Duranguense raises seven issues challenging the factual and legal bases of the order cancelling its permits. The standards that we apply on appeal to an agency ruling narrowly constrain our review. El Duranguense's challenges to the findings and conclusions of the administrative law judge, adopted by the TABC, that provide the basis for cancelling the permits fail for the following reasons:

(1)     the TABC did not violate El Duranguense's due-process rights, act arbitrarily or capriciously, or make an error of law when it did not request employment records or rely upon other traditional terms of employment to find that women working at the bar as ficheras were employees of the bar;

(2)     substantial evidence supports the findings that the persons who committed the acts that prompted cancellation of the permits were employees, agents, or servants of El Duranguense for purposes of establishing a violation of the Texas Alcoholic Beverage Code (Code);

(3)     substantial evidence supports the finding that El Duranguense permitted the possession and distribution of narcotics on the premises;

(4)     res judicata did not bar the TABC from bringing this separate enforcement action based on acts taking place in 2014 and 2015 after it had concluded an enforcement action based on acts taking place in 2016;

(5)     the TABC did not violate the law or act arbitrarily or capriciously by not revealing its investigation to El Duranguense before seeking cancellation of its permits; and

(6)     the TABC committed no constitutional violation and did not act arbitrarily or capriciously when it sought cancellation of El Duranguense's permits based on

2

multiple Code violations without having provided El Duranguense with an opportunity to voluntarily comply with the Code after the first violation. Accordingly, we will affirm.

## BACKGROUND

In September 2017, following an investigation by the Special Investigations Unit (SIU) of the TABC, the TABC brought an enforcement action against El Duranguense. Specifically, the TABC asserted that on or about November 6, 2014, December 20, 2014, and January 30, 2015, an agent, servant, or employee of El Duranguense (1) "solicited or permitted the solicitation of any person to buy drinks for consumption" by El Duranguense or any of its employees in violation of Sections 104.01(4) and 11.61(b)(2) of the Code; and (2) "possessed or sold, or permitted others to possess or sell a narcotic on the licensed premises" in violation of Sections 104.01(a)(9) and 11.61(b)(7) of the Code and Chapter 16, Section 35.31 of the Texas Administrative Code.

An administrative law judge (ALJ) conducted a hearing at the State Office of Administrative Hearings concerning the alleged violations. At the conclusion of the evidence and argument, the ALJ found in the TABC's favor, issued a Proposal for Decision containing findings of fact and conclusions of law, and recommended that El Duranguense's permits be cancelled. The TABC adopted the ALJ's findings and conclusions and issued a final order cancelling El Duranguense's permits.

3

El Duranguense filed a motion for rehearing, which the TABC overruled. El Duranguense then sought judicial review in district court. The district court conducted a hearing, reviewed the administrative record, and affirmed the TABC's order. El Duranguense now appeals.

## STANDARD OF REVIEW

We review administrative decisions by the TABC under the substantial-evidence rule codified in the Administrative Procedures Act (APA). Tex. Alco. Bev. Code Ann. § 11.67(b); Tex. Gov't Code Ann. §§ 2001.172, .174; *see also Bavarian Props., Inc. v. Tex. Alcoholic Beverage Comm'n*, 870 S.W.2d 686, 688 (Tex. App.—Fort Worth 1994, writ denied). Under this rule, a court "shall reverse or remand" a case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are, as applicable to this case: (1) "in violation of a constitutional or statutory provision"; (2) "affected by [an] error of law"; (3) "not reasonably supported by substantial evidence"; or (4) "arbitrary or capricious." Tex. Gov't Code Ann. §§ 2001.174(2)(A), (D), (E), (F); *see also Tex. Dep't of Pub. Safety v. Cantu*, 944 S.W.2d 493, 495 (Tex. App.—Houston [14th Dist.] 1997, no writ) ("[T]o reverse an agency decision, the reviewing court must conclude (1) that the agency's decision was erroneous for one of the reasons enumerated in [Section 2001.174(2) of the Texas Government Code], *and* (2) that substantial rights of the appellant have thereby been prejudiced.").

The test under the substantial-evidence rule is whether the evidence as a whole is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *See Bavarian Props.*, 870 S.W.2d at 688 (citing *Tex. Alcoholic Beverage Comm'n v. Sierra*, 784 S.W.2d 359, 360 (Tex. 1990)). The reviewing court is concerned only with the reasonableness of the administrative order, not with its correctness. *Id.*; *see also Villatoro v. Tex. Alcoholic Beverage Comm'n*, No. 05-12-00444-CV, 2013 WL 2423994, at *1 (Tex. App.—Dallas June 3, 2013, no pet.) (mem. op.) (citing *Melmat, Inc. v. Tex. Alcoholic Beverage Comm'n*, 362 S.W.3d 211, 215 (Tex. App.—Dallas 2012, no pet.)). "The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable in light of the evidence from which they were purportedly inferred." *Hinkley v. Tex. State Bd. of Med. Exam'rs*, 140 S.W.3d 737, 743 (Tex. App.—Austin 2004, pet. denied) (quotation marks omitted).

Whether there is substantial evidence to support an administrative decision is a question of law. *Tex. Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006). In our review, we look at the underlying findings of fact made in support of the agency's ultimate findings of fact on which the agency based its decision and determine whether the agency's findings are supported by substantial evidence. *Tex. Health Facilities Comm'n v. Charter Med.–Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984). Substantial evidence does not mean "a large or considerable amount of evidence"; rather, it refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Hinkley*, 140 S.W.3d at 743 (quotation

5

marks omitted). Although substantial evidence is more than a mere scintilla, the evidence in the record may actually preponderate against the agency's decisions and still amount to substantial evidence. *Bavarian Props.*, 870 S.W.2d at 688 (citing *Charter Med.–Dall.*, 665 S.W.2d at 452). Administrative decisions are presumed to be supported by substantial evidence, and the burden is on the complaining party to demonstrate otherwise. *See I Gotcha, Inc. v. Tex. Alcoholic Beverage Comm'n*, No. 2-07-150-CV, 2008 WL 2930614, at *2 (Tex. App.—Fort Worth July 31, 2008, no pet.) (mem. op.) (per curiam) (citing *Imperial Am. Res. Fund, Inc. v. R.R. Comm'n of Tex.*, 557 S.W.2d 280, 286 (Tex. 1977)); *see also Melmat*, 362 S.W.3d at 214. A reviewing court is not bound by the reasons given by an agency in its order, provided that there is a valid basis for the action taken by the agency; but this rule does not permit the court to find violations not initiated previously by the agency. *See Pretzer v. Motor Vehicle Bd.*, 138 S.W.3d 908, 914 (Tex. 2004) (op. on reh'g) (citing *Charter Med.–Dall.*, 665 S.W.2d at 452).

Under the substantial-evidence standard of review, a court may not substitute its judgment for the agency on the weight of the evidence on questions committed to agency discretion. *See* Tex. Gov't Code Ann. § 2001.174. A court also may not invade the fact-finding authority of an administrative agency. *Melmat*, 362 S.W.3d at 215. The ALJ is the sole judge of witness credibility in a contested case hearing. *I Gotcha*, 2008 WL 2930614, at *4; *Granek v. Tex. State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778–79 (Tex. App.—Austin 2005, no pet.) (op. on reh'g). A reviewing court

6

must resolve any evidentiary ambiguities in favor of the administrative order by concluding that substantial evidence supports the ALJ's decision. *Villatoro*, 2013 WL 2423994, at \*2; *I Gotcha*, 2008 WL 2930614, at \*4. If the evidence would support either affirmative or negative findings on a specific matter, the reviewing court must uphold the agency's decision. *Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 441 (Tex. App.—Austin 2011, pet. denied) (citing *Charter Med.–Dall.*, 665 S.W.2d at 453).

### APPLICABLE LAW

As a matter of public policy, the Code "is an exercise of the police power of the state for the protection of the welfare, health, peace, temperance, and safety of the people of the state." Tex. Alco. Bev. Code Ann. § 1.03. The Code allows the TABC to cancel a permit, if it is found, after notice and hearing, that "the permittee has violated a provision of [the] [C]ode or a rule of the commission." *Id.* § 11.61(b)(2).

The Code provides that "[n]o person authorized to sell beer at retail, nor the person's agent, servant, or employee, may engage in or permit conduct on the premises of the retailer which is lewd, immoral, or offensive to public decency," including (1) "solicitation of any person to buy drinks for consumption by the retailer or any of the retailer's employees"; or (2) "possession of a narcotic . . . or any equipment used or designed for the administering of a narcotic . . . or permitting a person on the licensed premises to do so." *Id.* §§ 104.01(a)(4), (9). "Narcotic" is defined as "[a]ny substance defined in the Texas Controlled Substances Act,

§§ 481.002(5), (6), (7), or (26)." 16 Tex. Admin. Code § 35.41 (2019) (Tex. Alcoholic Beverage Comm'n, Enforcement). Cocaine is a controlled substance. *See* Tex. Health & Safety Code Ann. §§ 481.002(5), (6), .102(3)(D).

Additionally, the Code allows the TABC to cancel a permit if it is found, after notice and hearing, that "the place or manner in which the permittee conducts the permittee's business warrants the cancellation or suspension of the permit based on the general welfare, health, peace, morals, and safety of the people and on the public sense of decency." Tex. Alco. Bev. Code Ann. § 11.61(b)(7). "Permittee" includes "a person who is the holder of a permit . . . or an agent, servant, or employee of that person." *Id.* § 1.04(11). A permittee violates Section 11.61(b)(7) if it "kn[o]w[s] or, in the exercise of reasonable care, should [know] of the offense [e.g., a person's knowing or intentional possession of cocaine on the premises] or the likelihood of its occurrence and fail[s] to take reasonable steps to prevent the offense." 16 Tex. Admin. Code § 35.31(b); *see also* Tex. Health & Safety Code Ann. §§ 481.032, .102(3)(D), .115(a).

## THE EVIDENCE[1]

### A.    The SIU investigation

The SIU is an investigative arm of the TABC that conducts "long-term and complex" investigations into "narcotics trafficking, human trafficking, alcohol

---

[1]Our discussion of the evidence is limited to facts necessary to give context to El Duranguense's arguments. Our discussion of El Duranguense's issues will set forth any additional facts.

8

beverage counterfeiting, tax stamp fraud, cargo theft, carrier related crimes, alcohol beverage theft, organized crime, and other violations." The SIU conducted an undercover investigation into El Duranguense to investigate a complaint regarding, among other things, prostitution, money laundering, human trafficking, organized criminal activity, and narcotics sales. SIU agents Agent Ernie Prieto and Agent David Garcia, under the supervision of Case Agent Kenneth Sherman and Lieutenant Joe Garcia, engaged in undercover operations at El Duranguense on November 6, 2014, December 20, 2014, and January 30, 2015.

**B.     Agent Prieto's testimony**

Agent Prieto testified that on November 6, 2014, a woman named Veronica solicited him to buy her drinks. When Agent Prieto agreed, Veronica motioned to the bartender who then brought her a beer, which cost fifteen dollars, and the bartender gave Veronica a red ticket. Veronica told Agent Prieto that the red tickets were the way she makes money; at the end of the night, she sells the tickets back to the bar for ten dollars each. Any time Veronica motioned to the bartender, the bartender would bring Veronica a beer and a ticket. Veronica's drinks were always fifteen dollars. The evidence in the record reflected that the regular price of drinks was three to five dollars.

Agent Prieto asked Veronica if she knew where he could get cocaine. Veronica told him that she could get the drugs from "Rodolfo." She took the agent's money, went outside to where the bartender told her Rodolfo was located, and then returned

9

to the agent and told him to stay at the bar. The agent observed a man whom he recognized as the parking attendant walk into the bar. Veronica went with the parking attendant around a wall out of the agent's sight; a few minutes later Veronica returned and asked the agent to accompany her to the bathroom where she delivered to him two baggies (or bindles) of cocaine.[2]

In the second operation on December 20, 2014, according to Agent Prieto's testimony, Veronica again solicited him to buy her drinks; she received a ticket from the bartender each time. At some point, Veronica started ordering two beers at a time (both for her), stating that she did not want to keep bothering the bartender. Agent Prieto also asked Veronica if she could hook him up with five bindles of cocaine. He gave her money, and then she left the table and came back and delivered five bindles to him. He did not know from whom she obtained the drugs on this occasion.

As to the third operation on January 30, 2015, Agent Prieto testified that Veronica again solicited him to buy her drinks, and each time she again received a ticket. At one point, Veronica introduced the agent to the bartender as her sister, and then Veronica asked the agent to buy the bartender a beer. The agent agreed and paid thirty-five dollars (fifteen dollars each for Veronica's and the bartender's drinks and five dollars for his drink). The bartender gave herself and Veronica each a ticket during this transaction. Agent Prieto again asked Veronica if she could hook him up.

---

[2]The record reflects that all substances purchased by the undercover agents during the three operations later tested positive for cocaine. For simplicity, we will simply refer to the substances as being cocaine.

After he gave her money, Veronica spoke to a man going by the name "Joe" at the bar whom the agent recognized as being Dario Villegas, the bar owner and permit holder. The agent observed Veronica and Dario speaking together and then walking outside the bar where the agent could still see Veronica. When they came back in, Dario went to the bar and Veronica delivered five bindles of cocaine to the agent.

According to Agent Prieto, on all three occasions, when he bought Veronica drinks, she would remain with him throughout the night until he left. She received a ticket, token, or some type of marker from the bar every time he bought her a beer that she had solicited.

## C.    Agent Garcia's testimony

The TABC also presented the testimony of Agent Garcia.[3] He testified that during the first operation on November 6, 2014, a woman named Amanda solicited him to purchase drinks for her. Each drink cost fifteen dollars, and in each transaction, Amanda received in return an undisclosed amount of money from the bartender. Agent Garcia also purchased two bindles of cocaine from Amanda. The agent observed Amanda obtain the narcotics from Rodolfo, whom he described as the doorman, in a hand-to-hand exchange.

According to Agent Garcia's testimony, during the December 20, 2014 operation, an employee named Reila solicited him for drinks. Each drink cost fifteen

---

[3]By the time of the hearing, this agent was working for a different law-enforcement agency. For simplicity, we will refer to this former SIU agent as "Agent Garcia."

dollars and she received something from the bartender during each transaction. Agent Garcia asked Reila if she could get him two bindles of cocaine. She said that she could, and then she contacted an unknown individual on the other side of the bar outside the agent's view. Reila came back and handed him two bindles of cocaine, and he handed her the money.

As to the third operation on January 30, 2015, Agent Garcia testified that he called or texted Amanda to meet him at the bar. After he entered the bar, he met Amanda and a patron named Roger; they sat at a table together directly in front of the bar. Shortly thereafter, Roger pulled out a small plastic bindle containing a white, powdery substance and snorted some of the substance in front of the agent, Amanda, and the bartender (Stephanie). Roger then gave the bindle to Amanda who snorted some of the substance. According to the agent, the bartender had a full view of the activities occurring at the table. Roger told the agent that "it was okay to consume narcotics in plain view, that the owner knew about it[,] and he was okay with it." During this third operation, Amanda asked Agent Garcia if he wanted some cocaine. He asked for two baggies. He then observed Amanda go to the bartender who handed Amanda two bindles of cocaine, and then Amanda gave the bindles to the agent. Amanda also asked Agent Garcia if he would buy her a drink, and he said yes. Amanda obtained drinks for herself, for Roger, and for the agent, and she told the agent that her drink cost fifteen dollars.

12

## D.    Dario Villegas's testimony

When Dario testified, he acknowledged that he owned El Duranguense.  He denied knowing a "Rodolfo," denied having any parking attendant at the time of these operations, and denied having been aware that Rodolfo was outside the bar directing traffic in the parking lot.  He further denied that Rodolfo, Veronica, Amanda, or Reila were his employees; that he supervised them; or that he had any type of employment agreement with them.  Dario testified that he identifies only three bar employees to the Texas Workforce Commission: himself and two bartenders.  But he also has two to three waitresses who he does not report to the TWC, and his wife works as an assistant manager at the bar almost daily.

Dario testified as to his description of the role played by a woman acting as a "fichera" (a term that we discuss in more detail below); he claimed that these are women "who come[] and offer[] services to the clients."  A fichera "comes to the client and asks them if they want to buy beer.  So then they pay her[,] and she goes and pays for the beer and keeps the change."  Dario testified that ficheras are common in Hispanic bars, that they are not bar employees, and that they are paid with the client's money and not by the bar.  He distinguished his "employees from customers or ficheras" in that "[t]he majority of [his] employees wear a uniform, a shirt with a logo of the company."  Dario testified that a bar owner does not supervise ficheras, nobody tells ficheras what to do, and it is not a fichera's job to open or close

13

the business or to clean tables. But he also testified that the ficheras at his bar called him "[t]he boss, Jose, [or] Joselitio."

Dario denied selling narcotics on January 30, 2015 (but, as the ALJ noted, he was not asked whether he possessed cocaine that evening). According to Dario, he was unaware that someone was selling narcotics on the premises; he would have run them off if he had known about it because he has security guards. At the same time, when he was asked whether he allowed ficheras in his bar, he responded, "We don't have control over that because we don't know."

## E. The ALJ's findings and conclusions

In his Proposal for Decision, the ALJ found, among other things, that Veronica, Amanda, and Reila were agents, servants, or employees for purposes of establishing a violation under Section 104.01(a)(4) of the Code and that each woman solicited drinks for her own consumption. The ALJ further found, among other things, that (1) Dario, the bartender (Stephanie), Veronica, Amanda, and Reila each possessed cocaine on the premises on one or more dates of the investigation and (2) El Duranguense knew, or in the exercise of reasonable care should have known, that Dario, Stephanie, Veronica, Amanda, and Reila possessed cocaine on its premises and failed to take reasonable steps to prevent cocaine possession on the premises.

The ALJ concluded, among other things, that on all three dates of the investigation, El Duranguense violated the drink-solicitation and narcotic-possession

14

prohibitions of the Code.  *See* Tex. Alco. Bev. Code Ann. §§ 11.61(b)(7), 104.01(a)(4), (9); 16 Tex. Admin. Code § 35.31(b).[4]

## EMPLOYMENT STATUS

El Duranguense's first three issues concern the ALJ's findings, adopted by the TABC, that Veronica, Amanda, and Reila were El Duranguense employees.  The ALJ found that the women were employees because:

a.    Agents Prieto and Garcia were approached by [Veronica], Amanda, and Reila who each asked . . . the respective agent to buy her a drink.

b.    [Veronica], Amanda, and Reila took the agents' money, brought the drink like a waitress would, and paid for the drink.

c.    The agents were charged [by the bar] more than the normal price for the drink when it was ordered by [Veronica], Amanda, or Reila.

d.    [Veronica] was not given change for the drink, but was given a red ticket.

e.    The purpose of the ticket was to allow [Veronica] to redeem a fee later.

f.    When Agent Prieto bought a drink for the bartender, she also gave herself a red ticket.

g.    [Veronica], Amanda, and Reila had access to areas of the bar that were not open to the public.

h.    Dario Villegas, the owner of [El Duranguense], knowingly allowed [Veronica], Amanda, and Reila to solicit drinks in El Duranguense.

Additionally, the ALJ concluded that because Veronica received a ticket to redeem a fee later, the bartender and by extension El Duranguense exerted control over her activities and that "[t]he evidence in this case . . . that El Duranguense asserted control

---

[4]Each of these violations independently supports cancellation of El Duranguense's permits.  *See* Tex. Alco. Bev. Code Ann. §§ 11.61(b)(2), (7), 104.01(a)(4), (9); 16 Tex. Admin. Code § 35.31(b).

over the activities of the ficheras through control of their funds and access to El Duranguense's customers, to [El Duranguense's] benefit." Because the bartender also gave herself a ticket when the agent paid for her drink, the ALJ determined that El Duranguense "had a scheme or plan to be followed with respect to ficheras." The ALJ added, Dario's "pose of helplessness ('We don't have control over that because we don't know') belies the fact that he was under a duty to maintain control over the premises. His excuse that the women in question were not employees in the traditional sense of the term falls short."[5]

In El Duranguense's first and second issues, El Duranguense argues that the TABC applied the wrong standard (one based on the above-listed factual findings) to determine that Veronica, Amanda, and Reila were El Duranguense employees, and that by applying that standard—or by applying no standard—to find that these women were employees, the TABC committed an error of law, acted arbitrarily and capriciously, and violated El Duranguense's due-process rights. El Duranguense contends that proving an employment relationship requires proof established by employment records, payment from the bar to each woman, an employment agreement, and a right to control each woman (such as through supervision, training, and scheduling). In its third issue, El Duranguense challenges whether substantial evidence supports the ALJ's findings adopted by the TABC that Veronica, Amanda,

_____

[5]On appeal, El Duranguense does not challenge the ALJ's findings relating to El Duranguense exertion of control over the ficheras.

16

and Reila were employees, agents, or servants of El Duranguense.[6] We resolve all three issues against El Duranguense.

## A. The TABC did not commit an error of law, act arbitrarily or capriciously, or violate El Duranguense's due-process rights by determining that Veronica, Amanda, and Reila were El Duranguense employees without securing employment records or proving other traditional terms of employment.

In support of its first and second issues, El Duranguense contends that the TABC committed an error of law, acted arbitrarily and capriciously, and violated due process because the TABC (1) did not secure employment records to establish the existence of an employment relationship with each woman and (2) did not require an employment agreement, payment from the bar, or control by the bar over a woman in order to determine that each woman was an employee.

These issues turn on an interpretation of the undefined term "employee" in Sections 104.01(a) and 1.04(11) of the Code. When we review agency decisions, we review de novo pure questions of law, such as statutory interpretation. *See Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017). Our goal when reading a statute "is to ascertain and give effect to the Legislature's intent." *Id.* (citing *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012)). An agency's interpretation of a statute that it enforces "is entitled to 'serious

---

[6]El Duranguense also includes Roger and Rodolfo in the list of persons it contends were not employees. But the TABC did not contend or find that Roger was an employee, and the ALJ did not make findings about Rodolfo's employment status. Because the employment status of these persons is not a basis for the agency's findings or conclusions, we need not address it. *See* Tex. R. App. P. 47.1.

consideration,' so long as the construction is reasonable and does not conflict with the statute's language." *Id.* (quoting R.R. *Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011)).

In its first two issues, El Duranguense ignores on appeal what it had essentially conceded when the ALJ made its findings and the TABC entered its final order: Veronica, Amanda, and Reila were acting as ficheras. When Dario testified, he did not dispute that these women were acting as ficheras or claim that he had never seen them before. Instead, he tried to place ficheras in a category separate from both employees and customers based on what clothes they wear, what duties they perform, and who he contends pays and controls them. But in El Duranguense's written closing argument, although it claimed that ficheras are not "real" employees for numerous reasons, it nonetheless admitted that ficheras "are given cash [by the bar] at the time of the beer purchase or . . . a ticket that will be exchanged [with the bar] for cash [at] a later time." Dario himself also testified that the ficheras at his bar call him "the boss."

During the SOAH hearing, the TABC presented evidence explaining what the SIU has uncovered about the role played by ficheras. Through the testimony of the undercover agents and lieutenant, the TABC demonstrated that it construes "employee" under the Code to include women like Veronica, Amanda, and Reila who were acting as ficheras for the bar. Agent Prieto testified that ficheras "are bar employees that solicit drinks at an inflated price for the bar"; "their job is to solicit

18

drinks and make beer sales for the bar." In exchange, they receive a ticket, token, or cash from the bar for each beer purchased at the inflated price. He stated that the women at issue (Veronica, Amanda, Reila) were ficheras.

Similarly, Agent Garcia testified that one purpose of a fichera is to keep male customers company and that they are paid through the presentation of alcoholic beverages. He explained that, for example, if a beer costs three dollars, the bar charges the customer fifteen dollars and some of the money goes to the bar and some goes to the fichera; "[t]hey're in partnership with the bar ownership." Garcia explained that the bar gets paid from the beer and also retains some of the money from the fichera exchange with the customer. In other words, a fichera's purpose is to generate beverage sales from which the bar profits and the fichera receives compensation by being given a portion of the inflated price of the fichera's beverage.

Lieutenant Garcia's testimony in particular explained how the TABC understands the drink-solicitation prohibition to include women who work as ficheras. He testified that the SIU considers ficheras employees for purposes of the Code based on the way they operate; he stated, "all indications to us are that they are employees." He based this on the interactions that the women have with the bars, that they may go behind the bar and handle money, and that they may go into areas that are not open to customers. In this particular case, the women went to areas of the bar not open to the public to get the drugs because "otherwise, our guys would have followed them out there to see who they got the drugs from."

19

Lieutenant Garcia further testified,

Right now, one of the biggest trends in law enforcement is to combat human trafficking and commercial sex slavery. One of the things that we go into these cantinas, and especially when we investigate ficheras[,] is we're trying to see whether or not there's any human trafficking occurring. Basically, when you've got women who are actually forced into that labor, forced into sex acts, things of that nature.

The drink solicitation situation is important to us because it's a precursor to human trafficking, to prostitution, to narcotic sales. More often than not, when we go and conduct these undercover operations, we end up spending time with a fichera. And then that's our conduit to get the drugs, that's our conduit to get the prostitution violations and other information . . . . It's not just that some wom[a]n is asking our guy to buy her a beer. That's why it's very important and that's why the legislature gave us a new statute, basically, that covers that drink solicitation and more clearly defined it. . . .

As it relates to the fichera operations themselves, . . . we found at this location . . . the common scheme that we [have] found throughout the State. They're compensated in one form or another. They either have tick marks that they keep records of[,] . . . get cash[,] or they do the tickets.

The ALJ also admitted into evidence a TABC self-evaluation report that included additional information about ficheras and their employment relationship with bar owners:

SIU is frequently involved in human trafficking investigations and has noted during these Investigations that the females working in TABC-licensed establishments are most often found to be Undocumented Aliens (UDAs). These UDAs are brought into the USA via a *coyote* who incurs the UDA's debt, which is usually about $3000-$5000. The coyote then *sells* the UDA to a person already inside the US who has an establishment and can put the UDA to work; the UDA can pay off the debt by working, usually forced labor. Most often the young females are sold to bars and cantinas so that they can work as *ficheras*, also known as *drink solicitors* or *taxi girls*. The females sell drinks

20

to customers at an inflated price; portions of the inflated price go to pay off the debt from the coyote fees. These drinks are most often un-invoiced . . . . The UDAs are typically encouraged to engage in prostitution and narcotics sales with the proceeds split with the business owner as a way to pay off their coyote fee more quickly.

The ALJ concluded that Veronica, Amanda, and Reila were El Duranguense's employees because El Duranguense exercised control over the ficheras for its own benefit, and the TABC adopted this conclusion. The TABC's interpretation of "employee" under the Code targets this practice by TABC-licensed bar owners who knowingly violate the Code by using a woman acting as a fichera while attempting to insulate itself from Code violations by keeping the woman off the payroll, by keeping the solicited drinks off the books, and by having the woman wear something other than a uniform and not cleaning tables. *See Villatoro*, 2013 WL 2423994, at *5–9 (rejecting permittee's argument that the TABC must prove a person was paid by a permittee and subject to the permittee's control to establish that the person is an employee and concluding that substantial evidence existed to support finding that fichera qualified as an employee).

El Duranguense asserts a number of hypothetical scenarios[7] to explain why it contends the agency reached an unreasonable result.[8] But we find these arguments

---

[7]For example, El Duranguense contends that under the standard applied to this case, "[a]nyone can be an employee if they buy a drink for someone else, pay on behalf [of] someone else, talk to someone else, and keep the change that someone else gave to them." Reliance upon such facts, according to El Duranguense, gives the TABC "unbridled discretion to determine that someone is an employee anytime it

21

unpersuasive. El Duranguense again ignores the fact that this case involved ficheras. The evidence was not simply that a woman received a ticket, *or* that a woman asked someone else to buy her a drink, *or* that a woman kept the change after a drink was purchased—here, the ALJ found that the bar owner "knowingly allowed [the women] to act as ficheras in El Duranguense, when he could have easily excluded them." Each women solicited a person to purchase a drink at an inflated price set by the bar for her to consume, and in exchange each woman received from the bar some form of compensation in a "scheme or plan to be followed with respect to ficheras." We cannot conclude that the result in this case is unreasonable.

El Duranguense also cites Section 5.44(a) of the Code, which grants the TABC the authority to request employment records, to argue that the TABC *has* to secure employment records in order to establish an employment relationship. But this statute does not establish any obligation to request such records in order to prove the existence of an employment relationship in a contested case. *See* Tex. Alco. Bev.

---

desires"; "imposes strict liability upon permit-holders for anyone who happens to be on the premises"; and "allows employment status to be established by speculation."

[8]An order supported by substantial evidence may nonetheless be arbitrary and capricious if the agency (1) failed to consider a factor the legislature directed it to consider, (2) considered an irrelevant factor, or (3) reached an unreasonable result. *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994); *Tex. Alcoholic Beverage Comm'n v. Hancock*, 269 S.W.3d 685, 688 (Tex. App.—Beaumont 2008, no pet.); *Tex. Alcoholic Beverage Comm'n v. Top of the Strip*, 993 S.W.2d 242, 252 (Tex. App.—San Antonio 1999, pet. denied).

22

Code Ann. § 5.44(a)(6) ("The commission . . . *may* . . . compel the production of pertinent books, accounts, records, documents, and testimony[.]" (emphasis added)).

By arguing that the TABC must resort to employment records and other documentation (including employment agreements and records relating to payment, training, and supervision) to prove that anyone is an "employee" under the Code, El Duranguense is trying to create an impossible standard, knowing that such records would not exist for women used illicitly as ficheras. El Duranguense has clear motives for not maintaining formal employment records for ficheras. *See Villatoro*, 2013 WL 2423994, at *6 (relying, in part, upon agent's testimony that "employment records are very hard to find" for ficheras and that "most of the time, employment records aren't kept for them" because they are "mainly dealt with on a cash basis" when concluding that a fichera was a bar employee). The lack of such documentation is especially likely here because Dario testified that he employs two waitresses and that his wife also works as an assistant manager at the bar; yet the only employees he reports to the TWC are himself and two bartenders. And Dario denied employing the three women at issue; he does not consider ficheras "real" employees. It is reasonable for the TABC to find the existence of an employment relationship without reference to traditional terms of employment because it prevents TABC-licensed establishments from doing an end run around the Code by simply not maintaining employment records for persons that a bar owner knowingly employs to engage in illegal activity on the licensed premises, such as ficheras.

Accordingly, we conclude that the TABC's interpretation of "employee" under the Code as including women working as ficheras under the permittee's control—without reference to employment records, such as employment agreements and payroll records—was reasonable, did not conflict with the statute's language, was not arbitrary or capricious, and did not violate due process. We overrule El Duranguense's first two issues.

## B. Substantial evidence supports the TABC's finding that Veronica, Amanda, and Reila were employees, agents, or servants.

In arguing in its third issue that there is not substantial evidence to support the finding that Veronica, Amanda, and Reila were employees, agents, or servants, El Duranguense again ignores on appeal that it conceded in the SOAH proceedings that Veronica, Amanda, and Reila were acting as ficheras.[9] In addition to Dario's testimony described above, in El Duranguense's written closing argument, it argued, among other similar statements, that "there are significant differences between Fischeras [sic] and *real* employees"; "Fischeras [sic] stay with customers the entire time"; "*Real* employees wear uniforms [and] Fischeras [sic] do not"; "Fischeras [sic] are not employed by the bar"; "Fischeras [sic] are paid by the customers, not the permit holder"; and "Fischeras [sic] are paid by the customers; they are given cash at

---

[9]To the extent El Duranguense's brief could be construed as a challenge to the ALJ's findings that these women were ficheras (findings evidenced by the ALJ's labelling them as such in its Proposal for Decision), we conclude based on our review of the record that substantial evidence supports those findings.

24

the time of the beer purchase or . . . a ticket that will be exchanged for cash at a later time." [Emphases added.]

Pointing to the same evidence it referenced in its closing argument, El Duranguense argues on appeal that there was "substantial direct evidence that the persons involved were not employees" and "circumstantial evidence to demonstrate the alleged persons were not employees." According to El Duranguense, the facts relied upon by the ALJ to find that the women were employees constituted "meager circumstantial evidence" that was legally insufficient to support a judgment and was contradicted by "[c]onclusive evidence" demonstrating that they were not employees. El Duranguense further contends that "direct" and "circumstantial" evidence demonstrated that the women were not employees. It points to Dario's testimony claiming that the women were not employees for various reasons (e.g., they do not wear uniforms, he did not supervise them) and to testimony from the agents that El Duranguense contends shows, among other things, that the agents did not obtain employment records; that the agents did not observe the bar supervising or training the women; and that the women stayed with the agents the entire evening.

El Duranguense's arguments are inapposite because they ignore the test applied under the substantial-evidence rule.[10] Our review concerns whether the evidence as a whole is such that reasonable minds could have reached the conclusion that the

[10]Further, the evidence that El Duranguense points to does not contradict the ALJ's finding that El Duranguense exercised control over the ficheras for its own benefit, and substantial evidence supports that finding.

25

agency must have reached in order to justify its action. *See Bavarian Props.*, 870 S.W.2d at 688. The ALJ was the sole judge of the credibility of Dario's testimony and was free to reject his testimony. *See Villatoro*, 2013 WL 2423994, at *2; *I Gotcha*, 2008 WL 2930614, at *4; *Granek*, 172 S.W.3d at 778–79. It is also the agency's function to resolve factual conflicts and ambiguities, and the purpose of the substantial-evidence review is to protect that function.[11] *Scally*, 351 S.W.3d at 452.

Like in its first two issues, El Duranguense's arguments also focus on whether these women satisfy a legal definition of employee. But "our focus here is not on whether [Veronica, Amanda, and Reila] fit the 'legal definition' of an employee . . . , but rather whether there was substantial evidence to support the determination that [they were each] an employee, agent, or servant for purposes of establishing a violation" of the Code. *See Villatoro*, 2013 WL 2423994, at *8; *see also Melmat*, 362 S.W.3d at 216 n.1 (rejecting a permittee's argument that *Ackley v. State*, 592 S.W.2d 606 (Tex. Crim. App. [Panel Op.] 1980), requires the TABC to provide evidence meeting the "legal definition" of "employee," "agent," and "servant" because *Ackley* addressed "the different meanings of the terms" and "did not address the types of evidence that would be sufficient to prove a person was, in fact, an employee, agent, or servant" for purposes of establishing a violation of the Code); *I Gotcha*, 2008 WL

---

[11]For the same reasons, the fact that Agent Garcia testified that on January 30, 2015, he asked Amanda to meet him at El Duranguense does mean that there is not substantial evidence to support the finding that Amanda was an El Duranguense employee, agent, or servant. *See Bavarian Props.*, 870 S.W.2d at 688; *Scally*, 351 S.W.3d at 452.

2930614, at *3 (noting that the term "employee" is not defined in the Code and stating that, as a result, "we apply its ordinary meaning in our analysis").

Accordingly, after testing each material finding, inference, and conclusion for evidentiary support, reasonable minds could have concluded that Veronica, Amanda, and Reila were El Duranguense's employees, agents, or servants on the nights in question. *See Villatoro*, 2013 WL 2423994, at *5–9 (concluding that substantial evidence supported ALJ's finding that a woman who was acting as a fichera was an employee, agent, or servant of permit holder when she solicited drinks); *Top of the Strip*, 993 S.W.2d at 249–50 (concluding that there was substantial evidence to support finding of a Code violation because "[r]easonable minds could have concluded that [night club] authorized a minor to dance topless," even though the club's accountant testified that she received no employment records for the dancer and the club's owner testified that "a disc jockey allowed the minor to dance and that she was not an employee").

Having concluded that substantial evidence supports the findings of the ALJ adopted by the TABC that Veronica, Amanda, and Reila were El Duranguense's employees, agents, or servants, we overrule El Duranguense's third issue. [12]

---

[12]In the Proposal for Decision, the ALJ determined that El Duranguense's violation of the drink-solicitation prohibitions of Section 104.01(a)(4) on the three separate dates provided grounds for cancellation of the permits. *See* Tex. Alco. Bev. Code Ann. §§ 11.61(b)(2), 104.01(a)(4). On appeal, El Duranguense does not challenge the findings or conclusions regarding drink solicitation except for the findings that Veronica, Amanda, and Reila were employees, agents, or servants. The

27

## COCAINE POSSESSION

El Duranguense's fourth issue challenges whether "substantial evidence support[s] the finding that [it] permitted the possession and distribution of narcotics on the premises." El Duranguense points to Dario's testimony disclaiming any knowledge about someone else selling drugs at the bar and claiming that he would have run them off had he known. El Duranguense then asserts a number of evidentiary arguments[13] regarding the testimony about certain events taking place on January 30, 2015; these arguments relate to whether Dario (the bar owner) or Stephanie (the bartender) permitted someone other than themselves to possess cocaine on the premises.[14] We resolve this issue against El Duranguense.

El Duranguense's arguments ignore the fact that a permittee violates the Code if an employee, agent, or servant of the permit holder violates the Code. *See* Tex. Alco. Bev. Code Ann. §§ 1.04(11) (defining "permittee" as "a person who is the

---

only other basis on which El Duranguense challenges cancellation of the permits based on drink-solicitation violations is its res judicata argument, which we address below.

[13]These arguments concerned whether the ALJ erred by admitting certain testimony and whether other testimony was "legally sufficient" to support a judgment.

[14]El Duranguense also argues that the ALJ abused its discretion by admitting Lieutenant Garcia's testimony that Dario was the source of the cocaine on El Duranguense premises. But the ALJ expressly stated that he "makes no finding with respect to that assertion" by Lieutenant Garcia. Even if the admission of Lieutenant Garcia's opinion testimony was an abuse of discretion, El Duranguense failed to demonstrate that its substantial rights were affected by the admission of the testimony when the ALJ did not rely upon Lieutenant Garcia's opinion when recommending cancellation of the permits. *See Cantu*, 944 S.W.2d at 495.

28

holder of a permit . . . or an agent, servant, or employee of that person"), 104.01(a)(9) (prohibiting a "person authorized to sell [beer] at retail" and "the person's agent, servant, or employee" from possessing or permitting a person to possess a narcotic on the licensed premises). The ALJ found that Veronica, Amanda, Reila, and Stephanie were each in possession of cocaine on the licensed premises on one or more of the dates at issue; and the TABC adopted those findings. None of El Duranguense's arguments includes any challenge to these findings on appeal.[15] Although El Duranguense appeals the finding that Veronica, Amanda, or Reila were employees, we conclude above that this finding is reasonable. El Duranguense does not challenge whether Stephanie was an employee.

Each woman's cocaine possession provides independent grounds for cancellation of the permits. *See* Tex. Alco. Bev. Code Ann. §§ 11.61(b)(2), 104.01(a)(9). Thus, we need not consider El Duranguense's evidentiary arguments—all of which relate to whether Dario or Stephanie permitted persons other than themselves to possess cocaine on the premises—because it is not necessary for the disposition of this appeal.[16] *See* Tex. R. App. P. 47.1. Stated differently, even if the

---

[15]To the extent El Duranguense's fourth issue could be construed as a challenge to the findings that Veronica (on all three dates), Amanda (on November 6, 2014, and January 30, 2015), Reila (on December 20, 2014), and Stephanie (on January 30, 2015) possessed cocaine on the licensed premises, we conclude based on our review of the record that substantial evidence supports these findings.

[16]Additionally, El Duranguense does not address on appeal the fact that when the district court heard this case, El Duranguense conceded that Dario was present

29

ALJ's evidentiary rulings raised in El Duranguense's brief were an abuse of discretion, El Duranguense failed to demonstrate that its substantial rights were affected by such rulings when other grounds independently support cancellation of the permits. *See Cantu*, 944 S.W.2d at 495.

Based on our review of the record, we conclude that substantial evidence supports the ALJ's findings adopted by the TABC that El Duranguense permitted the possession of cocaine on the premises on all three dates and that El Duranguense knew, or in the exercise of reasonable care should have known, that persons possessed cocaine in its licensed premises on each of the dates at issue and failed to take reasonable steps to prevent the offense. We overrule El Duranguense's fourth issue.

## RES JUDICATA

In its fifth issue, El Duranguense contends that the TABC's allegations in this case were barred by res judicata because they could have been brought in a prior action (described below). According to El Duranguense, the TABC committed an error of law, acted arbitrarily or capriciously, and violated El Duranguense's

---

for the transfer of cocaine on the licensed premises and that such presence provided grounds for cancellation of the permits unless res judicata applied. *See* Tex. Alco. Bev. Code Ann. §§ 11.61(b)(2), (7), 104.01(a)(9); 16 Tex. Admin. Code 35.31(b); *see also M.J.R.'s Fare of Dall., Inc. v. Permit & License Appeal Bd. of Dall.*, 823 S.W.2d 327, 330 (Tex. App.—Dallas 1991, writ denied) (concluding that an appellant waived arguments on appeal that implicated an administrative agency's fact-finding process when it conceded in district court that it had no grounds for a substantial-evidence review). We address El Duranguense's res judicata argument below.

constitutional rights by bringing this action after completion of the prior action. We conclude that this case is not barred by res judicata because pragmatically, the violations in this case are not based on the same transaction or series of transactions as the first proceeding.

**A.**    **Prior to bringing the instant case, the TABC brought an enforcement proceeding against El Duranguense based on alleged violations taking place in 2016.**

In October 2016, the TABC brought an enforcement proceeding against El Duranguense (Prior Proceeding), alleging that El Duranguense (1) sold and permitted the consumption of alcoholic beverages during prohibited hours on or about May 14, 2016; (2) permitted the solicitation of drinks for consumption on or about May 14, 2016; and (3) failed to timely provide requested records on or about May 22, 2016. *Tex. Alcoholic Beverage Comm'n v. El Duranguense Fort Worth Inc.*, SOAH Docket No. 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 (TABC Nos. 640236, 640241). An ALJ conducted a hearing on the Prior Proceeding on January 6, 2017, and issued a Proposal for Decision wherein the ALJ found that the violations had occurred, except for the alleged record-production violation. On July 12, 2017, the TABC adopted the ALJ's findings and conclusions and suspended El Duranguense's permits for twenty-eight days and assessed a civil penalty.

Then, on September 1, 2017, the TABC initiated the instant proceedings relating to the 2014 and 2015 violations. El Duranguense asserted the affirmative defense of res judicata. In the Proposal for Decision, the ALJ concluded that res

31

judicata did not bar this proceeding because (1) the "TABC Enforcement unit and staff attorneys were not aware of the SIU investigation until after the first El Duranguense case had concluded" and, thus, "could not have brought the case [in the first proceeding] because it was unaware it existed" and (2) the "two investigations would not have formed a 'convenient trial unit.'" The ALJ noted that the two cases "are reasonably related in subject, time, and location," but pragmatically "differ in their origin and motivation": the "May 2016 investigation was instigated by the TABC Enforcement unit," the "2014-2015 investigation was conducted by SIU," and Lieutenant Garcia explained that the SIU's motive is to "discover and remove organized criminal activities from the alcoholic beverage industry, not to correct errant behavior and aid a permittee in rehabilitating his business."

**B.**     **Generally, the doctrine of res judicata bars claims that are based on the same transaction, or series of transactions, out of which the first action arose.**

Res judicata applies to administrative agency adjudications. *See New Talk, Inc. v. Sw. Bell Tel. Co.*, 520 S.W.3d 637, 648–49 (Tex. App.—Fort Worth 2017, no pet.). "Res judicata, or claims preclusion, prevents the relitigation of a claim or cause of action that has been finally adjudicated, as well as related matters that, with the use of diligence, should have been litigated in the prior suit." *Barr v. Resolution Tr. Corp. ex rel. Sunbelt Fed. Savs.*, 837 S.W.2d 627, 628 (Tex. 1992). Texas follows the "transactional" approach to claims preclusion under which "a final judgment on an action extinguishes the right to bring suit on the transaction, or a series of transactions, out

32

of which the action arose." *Id.* at 631 (citing Restatement of Judgments § 24(1)).

According to the Supreme Court of Texas,

> A "transaction" . . . is not equivalent to a sequence of events, however; the determination is to be made pragmatically, "giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understandings or usage."

*Id.* (quoting Restatement of Judgments § 24(2)). A judgment in an earlier suit "precludes a second action by the parties and their privies not only on matters actually litigated, but also on causes of action or defenses which arise out of the same subject matter and which might have been litigated in the first suit." *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 798 (Tex. 1992).

On appeal, El Duranguense does not dispute that the record supports the ALJ's findings that underlie its conclusion that the case is not barred by res judicata. Thus, the issue of whether res judicata applies is purely a legal determination—i.e., whether the facts found support the ALJ's conclusion of law—which we review de novo. *See Tex. State Bd. of Dental Exam'rs v. Brown*, 281 S.W.3d 692, 707–08 (Tex. App.—Corpus Christi–Edinburg 2009, pet. denied).

**C.     The 2014 and 2015 violations in this case did not arise from the same transaction or series of transactions as the 2016 violations in the Prior Proceeding.**

Rather than challenge the ALJ's findings that provide the basis for the conclusion that the 2014 and 2015 violations did not arise from the same transaction

or series of transactions as the 2016 violations,[17] El Duranguense lodges a number of reasons why the court should nonetheless conclude that this case is barred by res judicata. We find El Duranguense's arguments unpersuasive.

---

[17]To the extent El Duranguense's briefing could be construed as including a substantial-evidence challenge, based on our review of the record, we conclude that these findings are supported substantial evidence. The evidence was undisputed that the SIU investigated the 2014 and 2015 violations and has the purpose of "discover[ing] and remov[ing] organized criminal activities from the alcoholic beverage industry" whereas the Enforcement Division investigated the 2016 violations and has a goal of "correct[ing] errant behavior and aid[ing] a permittee in rehabilitat[ion]." The TABC presented evidence of the 2014 and 2015 violations through six witnesses (two undercover agents, a case agent, a lieutenant, and two scientists) who did not testify as to the 2016 violations in the Prior Proceeding; three different agents and a different sergeant testified as to the 2016 violations. Although both cases involved drink-solicitation, the instant case included multiple alleged violations relating to cocaine that were not involved in the 2016 violations, and the 2016 violations included allegations about a record-request violation that was not at issue in this case. Veronica and Dario were involved in both matters, but Amanda, Reila, Rodolfo, and Stephanie were not identified as being involved in the 2016 violations. And the 2016 violations involved at least three different El Duranguense employees. *See Barr*, 837 S.W.2d at 631.

The TABC did not get "two bites at the apple" because it did not "run the same race again, hoping for a different outcome." *See Igal v. Brightstar Info. Tech. Grp., Inc.*, 250 S.W.3d 78, 92 (Tex. 2008), *superseded by statute on other grounds*, Tex. Lab. Code Ann. § 61.051(c). Between this case and the Prior Proceeding, the TABC prosecuted different violations involving a number of different employees occurring in different years that were investigated by different divisions with different motivations. *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 653 (Tex. 1996) ("The purposes [of res judicata] are to ensure that a defendant is not twice vexed for the same acts, and to achieve judicial economy by precluding those who have had a fair trial from relitigating claims."). The two proceedings entailed two discrete sets of proof. *See Samuel v. Fed. Home Loan Mortg. Corp.*, 434 S.W.3d 230, 234 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("The main concern [under the transaction approach to res judicata] is whether the cases share the same nucleus of operative facts.").

First, El Duranguense argues that because it had a "legal relationship" with the TABC as a regulator and regulated entity, "all claims arising from that relationship will arise from the same subject matter." Essentially, El Duranguense contends that when the TABC brings an enforcement action, it must litigate in that same proceeding all violations that any division of the TABC is investigating, regardless of the status of the investigation. We disagree.

El Duranguense essentially contends that an administrative agency with the authority to issue a permit has a "legal relationship" (akin to a contract) with a permit holder, and that all disputes between the parties relating to the subject matter of the permit (such as a Code violation) must be litigated in a single proceeding. But the two cases that El Duranguense cites do not stand for that proposition. *See Sanders v. Blockbuster, Inc.*, 127 S.W.3d 382, 386–87 (Tex. App.—Beaumont 2004, pet. denied) (holding that trial court did not broaden or reinterpret settlement in class-action suit when it determined that class members, defined as Blockbuster members who paid extended viewing fees (EVFs) between January 1, 1992, and April 1, 2001, were barred from asserting claims for EVFs paid after April 1, 2001, because the claims were based on the same "nucleus of operative facts" [i.e., the assessment of EFCs pursuant to the same EFV policies]; the policy had been adjudicated by the prior settlement and "new incidents" were part of the same "transaction" for purposes of res judicata); *Weiman v. Addicks-Fairbanks Rd. Sand Co.*, 846 S.W.2d 414, 419 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (holding that in landlord–tenant case,

35

summary judgment proof showed that the "same factual circumstances" gave rise to defendant's counterclaims in prior suit as plaintiff's claims in second suit and that the competing claims "formed a convenient trial unit" in the first action that would have achieved "a comprehensive conclusion to their business relationship" with regard to an expired lease).

Unlike the parties in *Weiman* and *Sanders*, there is no contract between the TABC and El Duranguense. Rather, the TABC's issuance of permits is an exercise of its police power to regulate the alcoholic beverage industry. *See* Tex. Alco. Bev. Code Ann. §§ 1.03 ("This code is an exercise of the police power of the state for the protection of the welfare, health, peace, temperance, and safety of the people of the state."), 11.03 ("A permit issued under this code is a purely personal privilege and is subject to revocation as provided by this code."); *Brazoria Cty. v. Basin Credit Consultants, Inc.*, No. 07-01-00304-CV, 2002 WL 31084700, at *1 (Tex. App.—Amarillo Sept. 18, 2002, no pet.) (not designated for publication) ("[A] permit[] is not a contract . . . but rather a grant of authority to do that which would otherwise be unlawful."); *Treviño & Gonzalez Co. v. R.F. Muller Co.*, 949 S.W.2d 39, 42 (Tex. App.—San Antonio 1997, no writ) (holding that a construction permit did not constitute a contract between the city and installer). Thus, El Duranguense's "legal relationship" argument has no application to this case.

Further, El Duranguense's definition of "transaction" as including any matter that involves the permits based on events taking place prior to the end of the first

36

enforcement proceeding is too broad. Even if there is an underlying "legal relationship" between two parties, there remain circumstances when not all claims with respect to that relationship must be brought in a single suit. *See TRO-X, L.P. v. Eagle Oil & Gas Co.*, No. 05-17-0052-CV, 2018 WL 4927214, at *7 (Tex. App.— Dallas Aug. 31, 2018, pet. denied) (mem. op.) (noting that claims in a business relationship should be combined when they involve "common core facts," but claims not accrued at the time of a previous suit are not barred by res judicata).

Second, El Duranguense argues that it "would not make sense to allow 'previous violations' to accumulate without adjudication or resolution" and that it would "violate a permit-holder's due process rights to consider an unresolved prior violation as conclusive proof of an administrative violation." But the ALJ expressly stated that it did not consider the violations found in the Prior Proceeding when determining what penalty to impose.[18] Although El Duranguense cites Section 11.641(a)(4) of the Code, it fails to explain how, if at all, that statute applies. *See* Tex. Alco. Bev. Code Ann. § 11.641(a)(4) (stating that the amount of a civil

---

[18]El Duranguense argues that because "the nature of a penalty under [the Code] is dependent upon the permit-holder's 'previous violations,'" it "would not make sense to allow 'previous violations' to accumulate without adjudication or other resolution." *See* 16 Tex. Admin. Code § 34.1(g). But here, the ALJ concluded that the violations in the Prior Proceeding were "subsequent" to El Duranguense's 2016 violations "only in the sense that they were brought to hearing after the 2016 violations." As a result, the ALJ concluded "that the 2016 violations will have no enhancing effect because of the plain language of the rule, and because giving the 2016 violations an enhancing effect would be fundamentally unfair." Thus, the existence of the violations at issue in the Prior Proceeding had no enhancing effect on the penalty imposed in this case.

37

penalty under Section 11.64 must be appropriate for the nature and seriousness of the violation, and the commission shall consider, among other things, a permittee's "previous violations").

Third, citing Section 11.641(c) of the Code, El Duranguense contends that an administrative violation may not be predicated upon a criminal case with a ruling adverse to the state. But in addition to being inapplicable because the violations here were not predicated upon the *outcome* of a criminal case, the proposition stated by El Duranguense is incorrect—a criminal case and an enforcement proceeding may be based on the same facts. *See id.* § 11.641(c) ("A civil penalty, including cancellation of a permit, may not be imposed on the basis of a criminal prosecution in which the defendant was found not guilty, the criminal charges were dismissed, or there has not been final adjudication."); *Tex. Alcoholic Beverage Comm'n v. D. Houston, Inc.*, No. 03-13-00327-CV, 2017 WL 2333272, at *4 (Tex. App.—Austin May 25, 2017, pet. denied) (mem. op.) ("Section 11.641 [of the Code] does not prohibit TABC from imposing penalties on the 'basis' or foundation of *common facts that underlie* 'a criminal prosecution,' but are not a 'criminal prosecution' itself.").

Accordingly, the ALJ's findings adopted by the TABC that the two cases did not form a convenient trial unit and that they differed in origin and motivation were reasonable. Because our ruling on whether the two cases arise from the same transaction or series of transactions is dispositive, it is not necessary to address El Duranguense's arguments relating to whether, with diligence, the Enforcement

Division could have brought this case in the Prior Proceeding.[19]  *See* Tex. R. App. P. 47.1.  Having rejected El Duranguense's arguments as to why it contends res judicata applies, we conclude that this action is not barred by res judicata and the TABC did not commit an error of law, act arbitrarily or capriciously, or violate El Duranguense's due-process rights.  We overrule El Duranguense's fifth issue.

## TABC POLICIES AND PROCEDURES

In its sixth issue, El Duranguense contends that the TABC committed an error of law and acted arbitrarily or capriciously because it violated its own policies and procedures.[20]  Specifically, El Duranguense argues that the TABC's policies required the TABC to conduct a settlement conference after it discovered a violation in order to provide El Duranguense with an opportunity to voluntarily comply with the Code before the TABC sought cancellation.  It also cites Section 5.361(a) of the Code, which states that the "commission shall develop a risk-based approach to conducting its enforcement activities," to support this argument.  *See* Tex. Alco. Bev. Code Ann.

---

[19]Specifically, El Duranguense does not challenge the finding that the Enforcement Division was unaware this case existed when it initiated the Prior Proceeding.  Instead, El Duranguense asserts that this finding does not matter because SIU's knowledge of the allegations in this case were imputed to the entirety of the TABC and that even if the Enforcement's Division's "ignorance" of the SIU investigation was a valid excuse to not bring this case in the Prior Proceeding, SIU's "failure" to do so was not.

[20]*See Kawasaki Motors Corp. U.S.A. v. Tex. Motor Vehicle Comm'n*, 855 S.W.2d 792, 795 (Tex. App.—Austin 1993, no writ) (op. on reh'g) (stating that for a finding supported by substantial evidence to be arbitrary and capricious, "it must be based on a violation of due process or some other unfair or unreasonable conduct that shocks the conscience").

§ 5.361(a). According to El Duranguense, the TABC exercised "a new and additional power or one that contradicts [a] statute" when the SIU conducted a long-term investigation, worked to cancel El Duranguense's permits, and did not seek voluntary compliance. *See* 16 Tex. Admin. Code §§ 35.31(b), (c)(16); Tex. Alco. Bev. Code Ann. §§ 11.61(b)(2), (7), 104.01(a)(4), (9). We conclude that the TABC's actions were reasonable and did not violate the Code or any policy or procedure in this case.

First, El Duranguense does not explain how the TABC violated the mandate to develop a risk-based approach to enforcement by not providing El Duranguense with an opportunity for voluntary compliance. El Duranguense does not cite a statute or TABC rule *requiring* the TABC to provide a litigant with an opportunity to prevent future violations by giving it notice of a violation prior to seeking cancellation of its permits. At most, it cites Section 2001.0058(b) of the Texas Government Code, which provides that an ALJ conducting a hearing in a contested case "shall consider applicable agency rules or policies *in conducting* the hearing." *See* Tex. Gov't Code Ann. § 2001.058(b) (emphasis added). But this statute says nothing about providing a permittee with a settlement conference and an opportunity for voluntarily compliance before the TABC seeks cancellation of a permit.

Moreover, the evidence that El Duranguense cites on appeal to prove the existence of an applicable policy does not exist. El Duranguense refers to a portion of Lieutenant Garcia's testimony to argue that TABC policies "require a meeting with the permit-holder to offer suggestions to prevent future violations, and to make

40

operational changes before conducting follow-up investigations." But Lieutenant Garcia actually testified in response to El Duranguense's counsel's questions, "You're asking me about things that [the] enforcement division does. We're completely different and we don't have anything to do with [settlement conferences]."

Similarly, El Duranguense cites Lieutenant Garcia's testimony to argue that in a "normal situation," a permit holder is invited to the TABC offices to meet with a lieutenant to discuss the facts of the case, told the identity of the employee committing the violation, and given an opportunity to terminate the employee and a settlement proposal. But Lieutenant Garcia specifically testified in response to questions asking him to confirm such policies exist, "Not SIU. SIU operates completely differently than enforcement. Enforcement does have a policy . . . that [after] a violation occurs, they issue a notice, and then they have the settlement meetings," but not the SIU. He further explained that the SIU is not "so much interested in the bartender or the DJ slinging narcotics at a bar"; the SIU was formed to "focus on cases involving organized criminal activity, human trafficking, narcotics trafficking, money laundering" and "affiliations with gangs, with the cartels, [and] with ownership involvement." Due to the "very nature of the cases that [the SIU] investigate[s], suspension is not even part of the equation. Basically, if [SIU] prove[s] the allegations that [it's] investigating, it's a cancellation case."

The TABC self-evaluation report admitted by the ALJ into evidence reflects that the SIU followed its policies and procedures in this case when it did not tip off

El Duranguense as to the existence of the investigation before seeking cancellation of the permits. According to the report, the focus of the SIU is Section 6.03(f) of the Code, which emphasizes the importance of keeping the alcoholic beverage industry free from organized crime, and cancellation is the most common sanction sought in these types of cases. *See* Tex. Alco. Bev. Code Ann. § 6.03(f). It further provides that the "SIU most frequently conducts multiple inspections prior to closing an investigation. Multiple violations are witnessed to establish that the violations were not a one-time incident or just a rogue employee." Here, the SIU conducted three operations while investigating criminal activity at El Duranguense in compliance with SIU's policies and procedures.

El Duranguense points out that the TABC self-evaluation report also includes the sentence, the "TABC schedules a meeting with the permittee and discusses the allegations and evidence" under the heading, "SIU: Concluding a Case." But this sentence does not evidence an SIU policy of providing settlement conferences and an opportunity for compliance after finding an initial violation. Rather, the report makes it clear that this meeting happens *after* the multiple-operation investigation has *concluded*, not in between operations; and the report does *not* state that at this meeting, the SIU provides the permit holder with an opportunity for voluntary compliance. Instead, the very next sentence reads, "Because SIU investigates those who are knowingly committing these violations and have multiple offenses, *cancellation* of the permit is the most common administrative sanction sought[.]" [Emphasis added.]

42

Next, El Duranguense alters course and challenges whether the SIU's practice of conducting multiple investigations and seeking cancellation without notifying the permit holder of the investigation reflects a "rational connection between the need to investigate [organized criminal activity] and the need not to alert persons who are or may be committing [such crimes] of the fact of that investigation until it is complete," as the ALJ found.[21] According to El Duranguense, it is "arbitrary and capricious to charge someone with permitting illegal activity without providing knowledge to the person as required by statute and policy." El Duranguense, however, cites no rule, policy, or statute that required the SIU to notify El Duranguense of the investigation into organized criminal activity allegedly occurring at the bar. As the TABC points out, "[e]arlier notice of the first or second offense would have compromised law

---

[21]In making this finding, the ALJ applied the standard set forth in a case cited by El Duranguense: *United States v. One 1985 Mercedes*, 917 F.2d 415, 422 & n.3 (9th Cir. 1990) (stating that a court may judge agency action to be arbitrary and capricious when the agency either did not follow its own policies or neglected to formulate necessary policies). The standard suggested is that an ALJ must enquire whether the TABC "examined the relevant data and articulated a satisfactory explanation for its action, 'including a rational connection between the facts found and the choice made.'" *Id.* at 422. We assume without deciding that the standard in *One 1985 Mercedes* applies. *See Cities of Corpus Christi v. Pub. Util. Comm'n of Tex.*, No. 03-06-00585-CV, 2008 WL 615417, at *13 (Tex. App.—Austin Mar. 5, 2008, no pet.) (mem. op.) ("The Texas Supreme Court has recognized that administrative agencies are entitled to considerable procedural flexibility, *see City of Corpus Christi v. [Pub.] Util. Comm'n [of Tex.]*, 51 S.W.3d 231, 262 (Tex. 2001), and that courts may interfere with the procedures of an administrative agency only if they are arbitrary and capricious or deny due process."); *Starr Cty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. App.—Austin 1979, writ ref'd n.r.e.) ("The major factor that runs throughout arbitrary[–]capricious review cases is that parties must be able to know what is expected of them in the administrative process.").

enforcement's investigation as well as its ability to conduct contemporaneous or future undercover operations at this or other establishments." Again, the premise of El Duranguense's argument—a law-enforcement agency has an obligation to jeopardize an ongoing investigation by disclosing that investigation to its target—is specious. The ALJ found that El Duranguense's own employees solicited drinks that the bar charged at an inflated price, possessed cocaine, and sold cocaine to the agents on the licensed premises. It was reasonable for the ALJ to conclude that El Duranguense permitted such activity. The fact that the SIU did not inform El Duranguense that it had uncovered such conduct in the course of its investigation does not render the finding or the TABC's actions arbitrary and capricious. *See Kawasaki Motors*, 855 S.W.2d at 795.

Accordingly, we conclude that the TABC's actions in not conducting a settlement conference while the investigation was ongoing was not arbitrary and capricious.

### STACKING OF CHARGES

In its seventh issue, El Duranguense contends that the TABC committed an error of law, violated its due-process and due-course-of-law rights, and acted arbitrarily and capriciously by "stacking" offenses when it waited until it had three violations before notifying El Duranguense of the violations.

The concept of "stacking" comes from Section 3.03 of the Texas Penal Code, which provides that the sentences for convictions arising out of the "same criminal

44

episode" that are tried together must run concurrently unless the convictions are for certain specified offenses. *See* Tex. Penal Code Ann. § 3.03(a)–(b). Thus, "stacking" occurs when one violation is split into multiple smaller violations in order to make the offense look worse than it is or to create more oppressive punishment.[22]

The TABC did not engaged in the "stacking of charges" by prosecuting multiple, different violations committed by different persons on three different dates. As the TABC points out, it imposes no *criminal* penalty and is statutorily required to enforce regulations and to impose sanctions and penalties for violations that represent a threat to public health, safety, or welfare. *See* Tex. Alco. Bev. Code Ann. §§ 1.03, 11.61(b)(2); 16 Tex. Admin. Code § 34.2 (2019) (Tex. Alco. Bev. Comm'n, Schedule of Sanctions and Penalties for Health, Safety and Welfare Violations). By statute, the TABC has the authority to cancel a permit based on a single violation of the drink-solicitation or narcotics-related prohibitions of the Code at issue in this case. *See* Tex. Alco. Bev. Code Ann. §§ 11.61(b)(2), 104.01(a)(4), (9); 16 Tex. Admin. Code 35.31(b).[23] Thus, the TABC's continued investigation into the bar did not necessarily

---

[22]For example, the undercover agents purchased multiple bindles at one time. If the agency had charged separate Code violations for each bindle, then that would be an example of "stacking," according to the TABC.

[23]*See also* 16 Tex. Admin. Code §§ 34.1(j) (providing that the penalty matrix, which provides for cancellation after a second violation, "does not apply to a contested case" brought under the APA), 34.2 (penalty matrix for health, safety, and welfare violations).

result in any additional or harsher penalty, but it did ensure that the first violation was not a one-time incident or due to the actions of a rogue employee.

El Duranguense cites *Patel v. Texas Department of Licensing and Regulation* to argue that the "actual, real-world effect (of Appellee's actions towards Appellant) . . . could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, [a] governmental interest." *See* 469 S.W.3d 69, 87 (Tex. 2015). This argument is confusing but appears to be a regurgitation of the same arguments that El Duranguense makes in support of its other issues regarding the lack of employment records and an opportunity for voluntary compliance. *See id.* We disagree with El Duranguense's position that the real-world effect of continuing an investigation until a pattern of criminal activity is established is not rationally related to the governmental interest of removing bad actors from the alcoholic beverage industry, and El Duranguense fails to explain how the practice is not rationally related. *See id.*

A TABC-licensed bar does not have a constitutional right to be notified when a policing authority has determined that the bar has violated the Code in the course of an investigation. Accordingly, we conclude the TABC did not impermissibly "stack" charges against El Duranguense when it continued investigating the bar to establish a pattern of criminal activity. We overrule El Duranguense's seventh issue.[24]

---

[24]In all seven issues that it asserts on appeal, El Duranguense makes the boilerplate statement, "Appellant complains of Findings of Fact 3-27 and Conclusions

46

## CONCLUSION

Having overruled all seven of El Duranguense's issues on appeal, we affirm the judgment of the district court affirming the final order of the TABC.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: March 26, 2020

---

of Law 4-7" from the Proposal for Decision. Except for those findings and conclusions that we have addressed above, El Duranguense did not adequately brief any legal or factual arguments, if any, applicable to each finding of fact or conclusion of law that it included in these boilerplate statements. *See* Tex. R. App. P. 38.1(i).